PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-2700
_____

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
Appellant

v.

ALLSTATE INSURANCE COMPANY
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No.2-01-cv-07042)
District Judge:  Honorable Ronald L. Buckwalter
_____

Argued January 14, 2015
Before:  HARDIMAN, SCIRICA and BARRY,
*Circuit Judges*.

(Filed: February 13, 2015)

Paul D. Ramshaw [Argued]
Equal Employment Opportunity Commission
131 M Street, N.E.
Washington, DC 20507

C. Felix Miller
Equal Employment Opportunity Commission
1222 Spruce Street, 8th Floor
St. Louis, MO 63101

Iris A. Santiago-Flores
Equal Employment Opportunity Commission
801 Market Street, Suite 1300
Philadelphia, PA 19107

John V. Gorman
Coleen M. Meehan
Morgan, Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103
        *Attorneys for Plaintiff-Appellant*

Donald R. Livingston [Argued]
Akin, Gump, Strauss, Hauer & Feld
1333 New Hampshire Avenue, N.W., Suite 400
Washington, DC 20036

Katherine M. Katchen
Akin, Gump, Strauss, Hauer & Feld
2001 Market Street
Two Commerce Square, Suite 4100
Philadelphia, PA 19103

Richard C. Godfrey
Jordan M. Heinz
Sallie G. Smylie
Kirkland & Ellis
300 North LaSalle Street
Chicago, IL 60654

Erica Zolner
Kirkland & Ellis
601 Lexington Avenue
New York, NY 10022
        *Attorneys for Defendant-Appellee*

Rae T. Vann
Norris, Tysse, Lampley & Lakis
1501 M Street, N.W., Suite 400
Washington, DC 20005
        *Attorney for Amici Curiae in Support of Defendant-Appellee*

_____

## OPINION OF THE COURT

_____

HARDIMAN, *Circuit Judge*.

This appeal comes to us following a summary judgment entered by the United States District Court for the Eastern District of Pennsylvania in favor of Allstate Insurance Company. In 1999, Allstate decided to reorganize its business and terminate the at-will employment contracts of some 6,200 sales agents, offering them the opportunity to work as independent contractors. As a condition of becoming independent contractors, agents were required to sign a

release waiving existing legal claims against Allstate. The Equal Employment Opportunity Commission sued Allstate, claiming that the company violated federal antiretaliation laws. The District Court disagreed and the EEOC appealed. We will affirm.

I

As the District Court rightly noted, the history of this case is "lengthy and convoluted." *Romero v. Allstate Ins. Co.*, 1 F. Supp. 3d 319, 332 (E.D. Pa. 2014). We won't repeat that history in full because it is so thoroughly explained in Judge Buckwalter's tour de force in *Romero* and in his opinion now under review. *See Romero v. Allstate Ins. Co.* (*EEOC*), 3 F. Supp. 3d 313 (E.D. Pa. 2014). Instead, we shall summarize the facts relevant to this appeal.

A

Over the past thirty years, Allstate has changed the way it sells insurance. In the early 1980s, agents worked out of Sears stores or company-owned offices under an employment contract designated R830. Allstate introduced the Neighborhood Office Agent Program in 1984, purportedly because it faced "flat productivity and the aggressive use of local independent contractor sales agents by its competitors." Allstate Br. 7. New agents hired pursuant to the Neighborhood Program signed a contract designated R1500, while existing agents had the choice of transferring to that contract or continuing their employment under the R830 contract. The Neighborhood Program allowed agents to secure their own office space, manage their own expenses, and invest money in their agencies; it did not give them transferable interests in their accounts, however, which remained the property of Allstate. Under both the R830 and R1500 contracts, Allstate agents were at-will employees and

4

were not entitled to any severance pay in the event that they were "terminated under the terms of any group reorganization/restructuring benefit plan or program[.]" *Romero*, 1 F. Supp. 3d at 336, 397–98.

In 1990, the company introduced a third business model, the Exclusive Agency Program, pursuant to which all new Allstate agents worked as independent contractors under a contract called R3001. In that capacity, Allstate agents had transferable property interests in their books of business and earned higher commissions than the R830 and R1500 employee agents, but they were neither reimbursed for office expenses nor provided employee benefits. Existing employees had the opportunity to apply to convert to independent contractor status as part of the Exclusive Agency Program, but they received no conversion bonus and had to repay any outstanding office expenses advanced by Allstate. They did, however, gain property rights in the accounts they serviced as employee agents, which became transferable after five years.

According to Allstate, the Exclusive Agency Program emerged as the company's most productive business model. Meanwhile, a settlement between Allstate and the Internal Revenue Service required Allstate to more closely supervise the operations of its Neighborhood Program agents in order to preserve their status as employees for tax purposes. Concerned about the inefficiency of running several different agency programs, Allstate decided to shift completely to the independent contractor model and abandon the R830 and R1500 programs. Accordingly, in November 1999, the company announced its Preparing for the Future Group Reorganization Program, pursuant to which some 6,200 employee agents would be terminated the following year.

In connection with their termination, the employee agents were offered four choices: (1) conversion to independent contractor status (the Conversion Option); (2) $5,000 and an economic interest in their accounts, to be sold by September 2000 to buyers approved by Allstate (the Sale Option) (3) severance pay equal to one year's salary (the Enhanced Severance Option); or (4) severance pay equal to thirteen weeks' pay (the Base Severance Option). Employees who chose the Conversion Option received a bonus of at least $5,000, were not required to repay any office-expense advances, and acquired transferable interests in their business two years after converting. All employees who chose not to convert and left the company were bound by noncompetition covenants in the original R830 and R1500 contracts.

Allstate required those who selected any of the first three options to sign a release of all legal claims against the company related to their employment or termination, including discrimination claims arising under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act (ADEA), and the Americans with Disabilities

Act (ADA).[1] The Release covered only claims that had accrued by the time the terminated employees signed it, not

---

[1] The Release stated:

> In return for the consideration that I am receiving under the Program, I hereby release, waive, and forever discharge Allstate Insurance Company, its agents, parent, subsidiaries, affiliates, employees, officers, shareholders, successors, assigns, benefits plans, plan administrators, representatives, trustees and plan agents ("Allstate"), from any and all liability, actions, charges, causes of action, demands, damages, entitlements or claims for relief or remuneration of any kind whatsoever, whether known or unknown, or whether previously asserted or unasserted, stated or unstated, arising out of, connected with, or related to, my employment and/or the termination of my employment and my R830 or R1500 Agent Agreement with Allstate, or my transition to independent contractor status, including, but not limited to, all matters in law, in equity, in contract, or in tort, or pursuant to statute, including any claim for age or other types of discrimination prohibited under the Age Discrimination in Employment Act of 1967, Title VII of the Civil Rights Act of 1964, the Americans With Disabilities Act, the Employee Retirement Income Security Act ("ERISA"), the Illinois Human Rights Act, and the West Virginia Human Rights Act as those acts have been amended, or any other federal,

7

future claims, and it did not bar them from filing charges with the EEOC, which many did. Almost all the terminated employee agents signed the Release, and thousands of them chose the Conversion Option.

B

Despite Allstate's efforts to avoid litigation, several former employee agents filed individual and putative class actions in the District Court seeking to invalidate the Release and alleging discriminatory discharge, retaliation, ERISA violations, breach of contract, and breach of fiduciary duty. *Romero*, 1 F. Supp. 3d at 358. The EEOC filed a civil action of its own that sought a declaratory judgment invalidating the Release on the ground that Allstate illegally retaliated against its employee agents by allowing them to continue their careers with the company only if they waived any discrimination claims. *Id.* The District Court granted summary judgment to Allstate in both cases, 2007 WL

> state, or local law or ordinance or the common law. I further agree that if any claim is made in my behalf with respect to any matter released and waived above, I hereby waive any rights I may have with respect thereto and agree not to take any payments or other benefits from such claim. I understand that this release and waiver does not apply to any future claims that may arise after I sign this Release or to any benefits to which I am entitled in accordance with any Allstate plan subject to ERISA by virtue of my employment with Allstate prior to my employment termination date.

App. 379.

1811197 (E.D. Pa. June 20, 2007), but we vacated those rulings because they were inadequately reasoned and insufficiently supported by evidence in the record, 344 F. App'x 785 (3d Cir. 2009) (per curiam). We remanded and ordered that the cases be reassigned to a different district judge and that the parties be permitted to conduct further discovery. *Id.* at 788, 790.

On remand, the district judge to whom the cases were reassigned consolidated the cases for administrative purposes and heard new motions for summary judgment. *Romero*, 1 F. Supp. 3d at 360. In an opinion concerning the employee agents' claims, the District Court granted Allstate summary judgment in part but held that trial was needed to determine whether the Release was signed knowingly and voluntarily and whether it was unconscionable. *Romero*, 1 F. Supp. 3d at 419. In a separate opinion, the District Court granted Allstate summary judgment in the Commission's retaliation suit. *EEOC*, 3 F. Supp. 3d at 316. The District Court rejected each of the Commission's theories of retaliation, holding that Allstate's requirement that agents choosing the Conversion Option waive their claims was not facially retaliatory because the policy did not discriminate on the basis of any protected trait, *id.* at 326; and that Allstate had not specifically retaliated against agents who spurned the Release because, among other reasons, refusing to sign a release did not constitute "protected activity" under the antiretaliation statutes, *id.* at 329–30.[2] The EEOC filed this timely appeal.

---

[2] The Court also rejected theories of "anticipatory retaliation," *EEOC*, 3 F. Supp. 3d at 334–35, and coercion, *id.* at 336; *see* 42 U.S.C. § 12203(b). The Commission conceded at oral argument that these claims are not at issue on appeal.

II

The District Court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345. Our jurisdiction is based on 28 U.S.C. § 1291.[3]

Exercising plenary review over the District Court's summary judgment, we will affirm only if, viewing "the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion," we conclude that a reasonable jury could not rule for the nonmoving party. *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (quoting *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995)).

III

Title VII, the ADEA, and the ADA proscribe discrimination in employment based on several personal characteristics. *See* 42 U.S.C. § 2000e-2(a) (race, color, religion, sex, national origin); 29 U.S.C. § 623 (age); 42

---

[3] The District Court's summary judgment was an appealable "final decision" despite the pendency of the *Romero* matter because that case was consolidated with the EEOC's action for administrative purposes only. *See Romero*, 1 F. Supp. 3d at 360. Although we follow a "case-by-case approach" in determining whether a final order in one of multiple consolidated cases is immediately appealable, *Bergman v. City of Atlantic City*, 860 F.2d 560, 566 (3d Cir. 1988), our precedents indicate that immediate appeal in one case is appropriate when the cases have not been "consolidated for discovery and trial or for all purposes," *id.*; *see Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 441 (3d Cir. 1977).

U.S.C. § 12112 (disability). They also prohibit employers from retaliating against employees who oppose or complain about discriminatory treatment. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). The antiretaliation provisions "are nearly identical," and "precedent interpreting any one of these statutes is equally relevant to interpretation of the others." *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002). Employers may not "discriminate against any individual because such individual has opposed any act or practice made unlawful by [the employment-discrimination statutes] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the employment-discrimination statutes. 42 U.S.C. § 12203(a) (ADA); *see also* 42 U.S.C. § 2000e-3(a) (Title VII); 29 U.S.C. § 623(d) (ADEA). A prima facie case of illegal retaliation requires a showing of "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Fogleman*, 283 F.3d at 567–68 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)).

The EEOC offers a few reasons why we should hold that Allstate unlawfully retaliated against its terminated employee agents. First, the Commission contends that the Release does not fall within the well-established rule that employers can require releases in exchange for post-termination benefits. EEOC Br. 21–24. Second, it argues that Allstate's conduct was per se retaliatory because the company "withh[e]ld a privilege of the employees' employment—the offer in the conversion option to continue their careers as Allstate agents—if they refused to release all their claims."

11

*Id.* at 20. Alternatively, the EEOC claims Allstate retaliated against the employee agents who refused to sign the Release by denying them the option to continue their careers with the company as independent contractors. According to the Commission, the holdouts' refusal to waive their claims constituted "protected opposition activity" that prompted Allstate to withhold the Conversion Option, an adverse employment action. *Id.* at 32–35. We first address the general validity of agreements like Allstate's Release before turning to the Commission's two theories of retaliation.

A

It is hornbook law that employers can require terminated employees to release claims in exchange for benefits to which they would not otherwise be entitled. *See, e.g.*, Mark A. Rothstein et al., 2 *Employment Law* § 9.22 (5th ed. 2014). Nothing in the employment-discrimination statutes undermines this rule—in fact, Congress enacted detailed requirements governing employee releases of ADEA claims in the Older Workers Benefit Protection Act of 1990 (OWBPA). 29 U.S.C. § 626(f); *see Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 426–27 (1998). Title VII and ADA claims are likewise subject to waiver by terminated employees. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 (1974) ("[P]resumably an employee may waive his cause of action under Title VII as part of a voluntary settlement[.]"); *Rivera-Flores v. Bristol-Myers Squibb Caribbean*, 112 F.3d 9, 12 (1st Cir. 1997) ("We conclude that such releases are permissible under the ADA[.]"). The EEOC concedes, as it must, the legality of such releases. EEOC Br. 17, 20–21, 23; Reply Br. 1, 13.

But even when particular requirements have not been imposed by statutes like the OWBPA, releases can be invalid

12

for various reasons. For example, they must be knowingly and voluntarily signed[4] and cannot waive future claims.[5] In addition, an employee who signs a release must receive consideration in return. *See, e.g.*, 29 U.S.C. § 626(f)(1)(D); *Long v. Sears Roebuck & Co.*, 105 F.3d 1529, 1538 (3d Cir. 1997); Rothstein, *supra*, § 9.22.

The EEOC begins by arguing that the well-settled rule that releases of claims are generally valid does not apply to the situation presented in this appeal. EEOC Br. 21. The Commission's argument goes like this: the only consideration adequate for a release of claims is "*severance* benefits," and Allstate's offer of an option to sell insurance as an independent contractor does not qualify because the employee agents "were not terminated in any normal sense." *Id.* at 22–23 ("[T]he conversion option was not a 'severance' benefit, but rather the opportunity [for the agents] to continue their Allstate careers."). There are a few problems with the Commission's postulate.

For starters, the notion that the Conversion Option was inadequate consideration for the Release is remarkably

---

[4] *See Gardner-Denver*, 415 U.S. at 52 n.15. This issue remains pending in the *Romero* case. *See supra* Section I-B.

[5] *See Adams v. Philip Morris, Inc.*, 67 F.3d 580, 585 (6th Cir. 1995) ("An employer cannot purchase a license to discriminate."); Rothstein, *supra*, § 9.22; *see, e.g.*, *Gardner-Denver*, 415 U.S. at 51–52 ("[A]n employee's rights under Title VII are not susceptible of prospective waiver."). Allstate's Release did not purport to waive future claims. *See* App. 379 ("I understand that this release and waiver does not apply to any future claims that may arise after I sign this Release[.]").

counterintuitive. The EEOC concedes that the Sale Option and the Enhanced Severance Option, both of which also required the employees to sign the Release, were valid. *Id.* at 34–35. It nevertheless contends that the Conversion Option—which was chosen by the vast majority of the terminated agents—was illegal. According to the Commission, Allstate could have complied with the antiretaliation statutes by simply firing all its employee agents for good, instead of giving them the opportunity to sell Allstate insurance in a different capacity. We are confident that federal laws designed to protect employees do not require such a harmful result.

Second, the Commission's argument that the Conversion Option was inadequate consideration for the Release is contrary to the undisputed facts of this case. The EEOC suggests that Allstate gave the terminated agents essentially nothing in exchange for releasing their claims. *See* EEOC Br. 23–24 ("[T]he Program, instead of offering them severance benefits, required them to release all their claims against the company in order to continue performing the same services for Allstate that they had been performing for decades."). In fact, each employee agent who signed the Release did so in exchange for something "in addition to anything of value to which the individual already [was] entitled[.]" § 626(f)(1)(D). The agents were entitled to neither continued employment (because they were at-will employees under the R830 and R1500 contracts) nor severance pay (because they were terminated pursuant to a group reorganization program). Moreover, even though Allstate allowed employee agents to convert to independent-contractor status during the decade preceding the 2000 restructuring, the Conversion Option was significantly more advantageous because it: (1) offered guaranteed conversion,

14

whereas Allstate had previously retained discretion to deny conversion; (2) came with a bonus; (3) excused repayment of any outstanding office-expense advances; and (4) gave the converting agent a transferable interest in his or her business after two years, rather than five. *See id.*; Allstate Br. 39. Thus, it is clear that Allstate's Conversion Option offered terminated employee agents something of value to which they were not otherwise entitled.

Finally, the EEOC admits that it knows of not "a single decision holding that it is unlawful for an employer to require its employees to release all their claims in order to continue working for the company." EEOC Br. 25. Nevertheless, it claims that Allstate is similarly bereft of authority supporting its position—except for one case, *Isbell v. Allstate Insurance Co.*, 418 F.3d 788 (7th Cir. 2005), which it accuses Allstate of misreading. EEOC Br. 25. There, Doris Isbell was terminated pursuant to Allstate's reorganization plan and refused to sign the Release, opting for the Base Severance Option. *Isbell*, 418 F.3d at 791–92. She sued Allstate for retaliation, but the Seventh Circuit rejected her claims. *Id.* at 792–93. The EEOC rightly notes that *Isbell* does not carry the day for Allstate here insofar as the Seventh Circuit rejected Isbell's retaliation claims on the ground that she was not terminated for discriminatory reasons, which is inapposite to the Commission's claim that Allstate's contingent offer of conversion was discriminatory retaliation. *See id.* at 793; EEOC Br. 26–27. Nonetheless, we note that the Seventh Circuit expressly acknowledged Isbell's retaliation theory, which mirrored the EEOC's theory here, and found it lacking. *See Isbell*, 418 F.3d at 797 ("Allstate did not retaliate against Isbell when it refused to hire her [as an independent contractor] after she refused to sign a release of liability.").

Like Isbell, the EEOC here fails to articulate any good reason why an employer cannot require a release of discrimination claims by a terminated employee in exchange for a new business relationship with the employer. We acknowledge the Commission's concerns about the prospects of employers trading releases for new business opportunities and terminated employees facing "financial pressure" when offered such a deal. EEOC Br. 32. But the EEOC fails to explain why this financial pressure is more offensive to the antiretaliation statutes than the pressure one is bound to feel when required to sign a release in exchange for severance pay.[6] In sum, we are not persuaded by the Commission's efforts to arbitrarily limit the forms of consideration exchangeable for a release of claims by a terminated employee.

B

Having determined that Allstate's conduct conformed with the settled rule that employers can exchange consideration for releases of claims, it is unsurprising that the Commission's theories of retaliation are invalid. The Commission posits that Allstate violated the antiretaliation statutes first by creating a policy that employee agents who

---

[6] The Commission also fails to show that its nightmare scenario—employers using a cycle of layoffs, releases, and rehiring to immunize themselves from suit—is a valid concern. *See* EEOC Br. 24–25. There is no indication that American employers have done or will do this to insulate themselves from the employment-discrimination laws, probably because such schemes would destroy employee morale, compromise business goodwill, and serve little economic purpose.

16

refused to sign the Release would not be permitted to continue their Allstate careers, and then by enforcing this policy and actually withholding the Conversion Option from those agents. Under both theories, the EEOC alleges that the "protected employee activity" in question was the refusal to sign the Release and the associated "adverse action by the employer" was Allstate's withdrawal of the Conversion Option.[7] *Fogleman*, 283 F.3d at 567. In fact, the EEOC has established neither protected activity nor an adverse action.

The antiretaliation statutes identify two forms of protected employee activity: "oppos[ing] any act or practice made unlawful by" the employment-discrimination laws and initiating or "participat[ing] in any manner in an investigation, proceeding, or hearing under" those laws. *E.g.*, 42 U.S.C. § 12203(a). The Commission argues that refusing to sign a release constitutes opposition to unlawful discrimination, but we disagree. In our view, such inaction does not communicate opposition sufficiently specific to qualify as protected employee activity. *See EEOC v. SunDance Rehab. Corp.*, 466 F.3d 490, 501 (6th Cir. 2006) (expressing skepticism that declining to sign a release could

---

[7] The Commission occasionally wavers by suggesting that the real adverse action was the termination of the employee agents—or at least that their termination was functionally equivalent to withdrawal of the Conversion Option. *See, e.g.*, EEOC Br. 35. We recognize that dismissing an employee qualifies as "adverse action" in common parlance, but the relevant action for retaliation purposes was the denial of conversion to the agents who refused to sign the Release.

17

be protected activity); *see also Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995) ("A general complaint of unfair treatment does not translate into a charge of illegal *age* discrimination."). Because Allstate's Release barred its signatories from bringing *any* claims against Allstate concerning their employment or termination, employee agents who refused to sign it might have done so for any number of reasons unrelated to discrimination. Indeed, as Allstate notes, the plaintiffs in the *Romero* case brought claims for breach of contract and breach of fiduciary duty. Allstate Br. 51. Accordingly, the EEOC cannot show that any adverse action taken by Allstate was triggered by opposition to unlawful discrimination, dooming its retaliation case at the outset.

Even had the Commission been able to establish protected activity, its argument would fail for lack of an adverse employment action. As we have mentioned, the terminated agents were not entitled to convert to independent contractor status. *See supra* Section III-A. And the Commission has cited no legal authority for the proposition that an employer commits an adverse action by denying an employee an unearned benefit on the basis of the employee's refusal to sign a release. There is significant support, meanwhile, for the opposite proposition. *See SunDance*, 466 F.3d at 502 (collecting cases).

The EEOC leans heavily on *EEOC v. Board of Governors*, 957 F.2d 424 (7th Cir. 1992), but that case only clarifies the Commission's failure in this case to satisfy the two essential retaliation elements just discussed. In *Board of Governors*, the Seventh Circuit invalidated a provision of a collective bargaining agreement that suspended an employee's contractual right to an internal grievance proceeding as soon as the employee initiated a judicial or

18

administrative proceeding concerning his grievance. *Id.* at 426–27. The Court held that the CBA provision violated the ADEA's antiretaliation provision because it authorized the employer to strip an employee of a "contractual right" and adversely alter a "condition of his employment" whenever the employee sought relief under the ADEA in an external forum. *Id.* at 430. In that case, the Commission identified a clear protected activity (*i.e.*, initiating a discrimination charge in an external forum) and paired it with an employer action that deprived employees of something to which they were entitled (*i.e.*, suspending the right to internal grievance proceedings). The EEOC fails to muster the same showing here, which makes all the difference.

IV

In offering each of its employee agents the Conversion Option, Allstate followed the well-established rule that employers can require terminated employees to waive existing legal claims in order to receive unearned post-termination benefits. The EEOC has neither given us reason to craft an exception to this rule nor articulated a valid retaliation claim under the relevant statutes. We therefore hold that Allstate did not violate the federal antiretaliation laws by requiring that employee agents sign the Release in order to avail themselves of the Conversion Option. Accordingly, we will affirm the judgment of the District Court.