Gorman, J.
The defendant in error, Viola Dillingham, on April 25, 1917, commenced an action in the common pleas court of Hamilton- county against the plaintiff in error, Frank A. Dillingham, her husband, making The Market National Bank, Louis G. Pochat, The Security Savings Bank & Safe Deposit Company and Anna M. Maloney parties defendant.
Her action was brought under Section 12001, General Code, under favor of which section she alleges in her petition that she and Frank A. Dillingham were married on November 10, 1908; that she is entitled in her own right and is the owner of a part of and share in the business carried on in the name of Frank A. Dillingham in the city of Cincinnati, which business is that of the manufacture and sale of a proprietary' medicine called “Plant Juice” which is now and has 'been widely and extensively sold in drug ■stores throughout the entire United States'. She further ■ says that her husband, from habitual intemperance and profligate habits, is about to waste and squander the said property and business and the profits thereof, to a part of and a share in ■which she is entitled in her own right; and that he is proceeding to and is about to proceed to fraudulently convert the entire business and profits therefrom to his own use for the purpose of placing them beyond her reach and depriving her of *250 their benefit. She further avers in her petition that the other defendants, The Market National Bank and others, have in their possession and under their control certain moneys and property belonging to said business, to a part of which she is entitled in her own right. She prays in her petition that a temporary restraining order issue restraining the defendant from disposing of or otherwise interfering with the said business, its moneys or credits, choses in action or property, and restraining the defendant from in any way transferring, delivering or turning over to any person whomsoever any money, property or security in their 'hands in the name of or being held for Frank A. Dillingham, or the Dillingham business, or the Plant Juice business. She further prays for a restraining order against the other defendants from permitting Dillingham or any other person from having access to any safe-deposit box in the name of Frank A. Dillingham or the Dillingham business or the Plant Juice business, until further order of court. And she prays for a further restraining order restraining Anna M. Maloney from permitting Frank A. Dillingham to in any wise interfere with or dispose of the said business or any of the property, moneys, credits and choses in action of the said business, and from paying over or delivering tq said Dillingham any moneys or the equivalent thereof arising from the proceeds or profits of the above-described business. And she further prays that upon a final hearing the temporary restraining order asked for may be made permanent. She further prays the court to appoint a receiver to manage *251 and control the above-described business for' the benefit of herself, and prays the court to make such other order in the premises as it deems just and proper.
Upon the filing of this petition the court made an order dispensing with the giving of notice to the defendant, as required by the rules of court upon the application for' a restraining order, upon the grounds that the giving of the notice would defeat the purpose of the injunction. Defendant Dillingham was not in the jurisdiction of the court, and notice was published for him according to the law.
Upon the day of the filing of the petition a temporary restraining order was issued as prayed for in the petition, and the business carried on in the name of Frank A. Dillingham was thus prevented from being sold, disposed of or carried on.
Two days after the filing of the petition, without the presence of the defendant and without any service being made upon him, the court of common pleas appointed a receiver of the business described in the petition, and in the entry appointing the receiver it was recited that Messrs. W. W. Dickerson and Robert Black appeared in court as the attorneys of Frank A. Dillingham. The ■court fixed the amount of the receiver’s bon’d at $30,000 and ordered the .entire business and assets of Dillingham to be placed in the hands of the receiver and directed the receiver to carry on the business and employ the necessary help and purchase the necessary material therefor, and to do all things necessary to 'prosecute the business. *252 Publication of constructive, notice for Dillingham was then made, as required by law.
Counsel for Dillingham filed a petition in error in the court of appeals, from the judgment appointing the receiver, said cause being numbered on the docket of this court N'o. 1101. Upon application for a stay' of execution in this court an order was made staying the appointment of the receiver upon the defendant Dillingham giving bond in the sum of $50,000, and further proceedings in the common pleas court were thereupon stayed.
Thereafter in the common pleas court a hearing was had at great length. A great mass of evidence was adduced before the court, and on the 31st day of July, 1917, the court reappointed Frank C. Zumstein receiver of all the business, property and assets of the Dillingham business, and of Frank A. Dillingham, and of the Plant Juice business. No other relief was asked in the petition except an injunction restraining the defendant Dillingham from disposing of the property and restraining the other defendants from permitting any of the property in their hands belonging to Dillingham to be taken and disposed of; and the further prayer for the receiver.
In' the first appointment by the court of common pleas the receiver was designated as a temporary receiver; the last appointment merely provides for the appointment of a receiver without any limitation as to the time of the receivership, and without any reservation for any further order of court. The predicate upon which the court based this order for the appointment of the *253 receiver was that Dillingham, plaintiff’s husband, had been wasting and squandering and was about to waste and squander the assets and profits of the said business, one-half óf which belonged to the plaintiff, by reason of habitual intemperance and profligate habits, and was proceeding to and was about to proceed to fraudulently convert the half of the said business • and profits aforesaid, belonging to the plaintiff as aforesaid, to his own use, for the purpose of placing them beyond the reach of the plaintiff and depriving her of their benefit. And the court further found that all of the allegations of the plaintiff’s petition were true and that the plaintiff was entitled to the relief prayed for in her petition. The receiver was authorized and- directed to carry on the business, employ all the ■ necessary help, purchase all the necessary materials, and to do all things necessary to carry on and promote the business, and to take charge of all the property, and out of the profit's thereof to pay one-half to .the plaintiff Viola’ Dillingham. And all persons having any property or choses in action in their possession belonging to said Frank A. Dillingham or to the business were directed to turn over the same to the receiver. The order was quite a sweeping one, and dispossessed Dillingham entirely of any dominion or control over the property or business, and placed it in the hands of the receiver without limit as to time, and without limit as to authority to carry on the business.
Dillingham excepted to this order, and prosecutes error to this court in proceeding No. 1171 on the docket of this court.
*254 We have, therefore, two error cases in this court growing out of the original litigation brought by the defendant in error.
It is unnecessary to state anything further with reference to the first case, No. 1101, inasmuch as the purpose of the proceeding was merely to stay the execution of the judgment entered in the common pleas court appointing a receiver. temporarily. That proceeding having been stayed, all the matters necessary to be considered in this error proceeding will be considered in the last proceeding brought herein, No. 1171.
It appears from the record in the case that previous to the bringing of this action in the common pleas court' for the appointment of a receiver and for an injunction to restrain Dillingham from disposing of the property, the defendant in error, •Viola Dillingham, brought an action in the common pleas court, in the division of the court of domestic relations, praying for alimony against the defendant, Frank A. Dillingham. This suit -was filed in the court of domestic relations September 16, 1916, more than seven months before the commencement of this action for the appointment of a receiver. In her petition in the common pleas court, division of domestic relations, plaintiff set out, inter alia, that the defendant had for many years been engaged in the manufacture in the city of Cincinnati of a proprietary medicine called “Plant Juice” which is widely and extensively advertised and sold in drug stores throughout the entire United States. She averred that defendant was possessed also of large quantities of valuable stocks and bonds, and also of a *255 very large number of extremely valuable diamonds and other personal property. She also set out in this petition for alimony that defendant had been guilty of wrongdoing in many places throughout the United States, and that he bad been guilty of gross neglect of duty, and that he had remained away from the plaintiff for a long time and refused to communicate with her. She further alleged that' he had been guilty of habitual drunkenness for a number of years past. She averred that he had an interest in the business of the manufacture and sale pf said proprietary medicine known as “Plant Juice,” and that he was about to dispose of or encumber same so as to defeat her from obtaining alimony. She prayed for temporary alimony during the hearing of the cause, and for her expenses during the prosecution of this suit; and that upon a final hearing a reasonable alimony be allowed out' of the property of said Frank A. Dillingham. She further asked that an injunction issue restraining Dillingham from disposing of any property or of the business known as “Plant Juice.” ■ •
A temporary restraining order was issued by the judge of the court of domestic relations, without bond.
In no place in the petition of the plaintiff for alimony did she aver that she had any interest in the business known as “Plant Juice,” but though she does not state specifically that the business and property belonged to the husband Frank A. Dillingham, the averments of the petition would lead one to infer that she claimed he was the *256 owner of this 'business, and that she had no interest therein except as the wife of Frank A. Dillingham.
The question to be determined in this case turns upon the construction and application of Section 12001, General Code, to the facts in this ease. That section reads as follows:
“A married woman may file a petition in the common pleas court, setting forth that from habitual intemperance, or other cause, her husband is about to waste and squander the property, legal or equitable, money, credits, or choses in action, to which she is entitled in her own right, ór a part thereof, or is proceeding, or about to proceed, ■fraudulently to convert them, or a part thereof, to his own' use, for the purpose of placing them beyond her reach, and depriving her of their benefit, whereupon the court may enjoin him from disposing of, or otherwise interfering with, such property, money, credits, or choses in action, appoint a receiver to manage and control them for the benefit of the wife, and also make such other order in the premises as it deems just and proper. On filing the petition, a provisional injunction also may be allowed as in other cases, with or without ■bond, at discretion. Such petition shall be filed in the county where the petitioner resides, and the husband made a party defendant, as in the case of a petition for a divorce.”
'It' is claimed by plaintiff in error that under this section the common pleas court has power and authority to appoint a receiver not only for the property owned by the wife in her own right, but also for the property of the husband if the same is in any way joined with that owned by the wife.
*257 At the outset we may say that a careful consideration of the evidence in this case satisfies us that it is not sufficient to establish the ownership of Viola Dillingham to any of the property claimed by 'her in the petition filed in the court of common pleas. We think the evidence is insufficient to establish her ownership and title' to any of the prop-' erty. The business was established by Dillingham many years ago. She claims that in 1912, at Houston, Texas, her husband orally told her that he would give her a half interest in the'business. It is claimed that this statement of the husband was heard by a man by the name of Briscoe, who was acting in the capacity of a private secretary for Mrs. Dillingham., Briscoe on the witness stand testified that he heard this conversation; but the facts and circumstances of 'his employment and service with the Dillingh'ams would lead us to believe that he was not present at the time the wife says this conversation took place. Furthermore, it was shown on the trial of the case that Briscoe had been convicted twice, at least, in the courts; and upon being questioned as to his conviction he denied it. But the proof adduced by counsel for Dillingham established his conviction. Pending the hearing of the case after this proof was adduced Briscoe fled the state and has not since been heard from. More than a year after the time when the wife claims that Dillingham gave her a half interest in this property, she wrote him a letter while he was in San Francisco. This letter is dated March 17, 1913. ' In this letter, among pther -things, she says:
*258 “This is another holiday, but holidays come and 'holidays go and I never know anything about, them. It is getting to be rather a treadmill sort of thing; not that I mind that in the least if I was getting anything out of k. I like to work and would not mind the daily grind, also evenings and Sundays too, if I had any sort' of share in it. Of course I do not know the workings of your brain but it seems to me the many protestations of jour ■love, etc., lack any convincing weight. I am giving every minute of my waking hours to the business; it seems only fair that I should share equally.”
The 'husband -denied that he ever had such conversation with her as that testified to by her, and the evidence disclosed that she never drew any money from the business except upon Dillingham’s order and Dillingham’s checks. She had nothing to do with establishing the business; none of her individual or private property or funds went into the business; and the conduct of Dillingham and the conduct of the business, the testimony of numerous witnesses, the letters that passed between the parties, and the conduct of Mrs. Dillingham herself, appear to us to conclusively rebut the claim that she was given an interest in this business.
But', assuming for the purposes of the case, that the facts in the case do establish that she was given an interest in this business, then we are to consider whether or not under Section 12001 the .court of common pleas was authorized and warranted in appointing a receiver for this entire business because the wife was an owner of one-half 'interest therein.
*259 It will be interesting to trace the history of Section 12001, General Code. This section appears under the subdivision of Divorce and Alimony, Part Third, Title IV, Division VII, Chapter 3, of the General Code of Ohio, and it has been placed in this chapter and subdivision since the codification in 1880. It appears to 'have been considered by the codifier, and also by the legislature when it passed this enactment, as a proper proceeding under the chapter for divorce and alimony.
Under the Constitution of 1802 there was no provision made for divorce and alimony, and it was the practice during the early days of the legislature for that body to pass a special act providing for the divorce of married people. The supreme court in the case of Bingham v. Miller, 17 Ohio, 445, finally called a halt on this practice ■by holding that the granting of divorce by the legislature was a usurpation of judicial functions by that body.
On January 7, 1824 (22 O. L., 341), the general assembly passed an act concerning divorce and alimony and vested in the supreme court of the state that sole jurisdiction of granting divorces When any cause existed for a divorce as mentioned in that act. There was also provision made in' the act for the custody and maintenance of children and the allowance of alimony in a proper case. There was no provision for a suit for alimony independent of an, action for divorce.
On March 6, 1840 (38 O. L., 37), the legislature passed another act concerning divorce and alimony, and repealed the act of January 7, 1824. In this latter act of 1840 the supreme court was again *260 given sole cognizance of granting divorces for the •causes enumerated in the act; but there was no provision made for alimony independent of the action for divorce and alimony. In other words, alimony could be granted in a divorce proceeding but not a separate proceeding.
On March 2, 1846 (44 O. L., 115), the legislature passed an act to amend the act concerning divorce and alimony passed March 6, 1840. This act was the original progenitor of Section 12001, General Code. It reads as follows:
“Be it enacted by the General Assémbly of the State of Ohio, that any married woman, by her next friend, may file her bill in chancery in the supreme court', or court of common pleas, setting forth that her husband, from habitual intemperance, or any other cause, is about to waste and squander the property to which he is entitled in her right [italics by court], or any part thereof, or is proceeding fraudulently to convert the same to his own use, for the purpose of placing it beyond her reach, and depriving her of the benefit thereof; and the court, upon the hearing of the case, may enjoin the husband from disposing of, or otherwise interfering with such property, and may'appoint a receiver, to manage and control the same, for the benefit of the wife; and may •also make such other order in the premises as they may deem just and proper.”
'Spme slight changes have béen made in the verbiage of this act in the codification of 1880, the most important change being that whereas in the original act the property mentioned is that “to which he is entitled in her right,” by the codi *261 fication of 1880 that language is changed so as to read, “the property, legal or equitable, money, credits, or choses in action, to -which she is entitled in her own right.”
Manifestly the purpose of this act of 1846 was . to protect a married woman in the enjoyment of her own separate property. The rule of the common law at that time prevailed in Ohio that a woman upon her marriage lost her entire entity; her existence and her life were merged in that of her husband. He was everything; she was nothing. She lost 'her name; all of the personal prop- ■ erty which she had in her own right and her own name became his, except choses in action, and they became his whenever he saw fit to reduce them to his possession. She had no right to bring an action in her own name except as provided by statute. She could not enter into any contractual relations. She could not sell or dispose of her property without her husband’s consent and without him joining with her. Her personal earnings belonged to her husband and he could subject them to his possession.
But this had' been the state of the law from time immemorial. Not only did her person belong to her husband, but all her pronerty. She was as much a slave as though he had bought and paid for her and owned her absolutely, and all her belongings.
The legislature from time to time, during, these middle and dark ages of Ohio, was endeavoring to ameliorate to some degree the condition of the married woman; and it is evident that the purpose of. this legislation was to give her some benefit *262 ■and enjoyment of her separate estate, the property that came to her either by inheritance or gift, or by her own earnings when she was a femme sole, and to prevent an intemperate and wasteful husband from dissipating her property and depriving her and her 'children óf the benefits thereof. She could not bring a suit in her own name at that time as the act plainly shows, but it would have to be brought by her next friend; and it had to be brought in chancery in the supreme court or the court of common pleas. No one will question the justice and equity of this humane provision of the legislature for the protection of the married woman. This act continued to be the law down to the present time with the exception that now she may bring an action in her own name and is not obliged to have to resort to her next friend.
In 1851, March 24 (49 O. L., 102),' jurisdiction was conferred upon the courts of common pleas of the state to grant alimony independent of divorce, for the several grounds set out in the act, and it is provided therein that the proceedings in an action for alimony shall be-conducted in all respects as in cases for divorce. This is the first time courts of common pleas were given jurisdiction to hear and determine actions for alimony independent of actions for divorce.
On March 11, 1853 (51 O. L., 377), the legislature passed an act concerning divorce and alimony, which act was to take the place of all the previous acts relating to divorce and alimony. In -this act, under Section 14, is set out the provision of the -act relating to a married . woman *263 bringing an action for the appointment of a receiver .for her separate property. The language of Section' 14 is substantially the same as the language employed in the original act passed March 2, 1846, with this exception: it relates to property, moneys 'and credits to which she is entitled in her own right. The legislature having changed the phraseology from the language employed in the original act as being property to which he was entitled in her right, recognized evidently that it was her property to which she was entitled in her own right, and related to her separate property. This act repealed all previous acts touching divorce and alimony' and also the act providing for an- action for a receiver of the wife’s -separate property; but the new act embraces not only all the matters covered by the previous legislation on the subject, but additional legislation also.
This act was again amended April 15, 1857 (54 O. L., 131). Section 14 of the original act— now Section 12001, General Code — was not changed or amended by this act.
From 1857 to 1880 there was no change made in the divorce and alimony statutes.
In 1880 the codifying commission collected all these provisions relating to divorce and alimony under Part Third, Title I, Division 7, Chapter 6 of the Revised Statutes, Sections 5689 to 5706, inclusive. In this chapter -is found Section 5705, which was originally Section 14 of the act of March 11, 1853, and is Section 12001, General Code, as it now exists.
*264 No change was made in this section from 1880 down to the present time, and the codifying commission of 1910, and the legislature which adopted and ratified the acts of the commission, left it substantially as it was then in force.
In 1880 when the codifying commission collected all the laws relating to divorce and alimony, it was necessary -to retain present Section 12001, General Code, because at that time a married woman could not sue or be sued in her own name; she could not hold her own property in her own name, although the legislature at that time had made quite an advance in emancipating woman from the enthrallment of her husband.
In 1887 an act was passed which practically emancipated a woman from the control of her husband. She has since that time a right to contract and be contracted with as though unmarried; she has a right to hold in her own name and for her own use all her separate earnings acquired by her, or by inheritance, or by gift, or in any other legal manner, <and is free from the rights of her husband and from his control and subjection as to all her property. She has a right to enter into business as though unmarried, and in any manner to enter into any obligation she may desire, as though she were a femme sole; she cannot by contract between herself and husband change the legal status of their married relations. See Sections 7995 to 8004, inclusive, General Code, Part Second, Title VI, Chapter 1, Domestic Relations. The only interest he has in her property during her life is a contingent right of dower in her real estate.
*265 The state of the law at the present time, therefore, is that the separate property of a married woman 'is not in possession or under control of the husband unless she sees fit to give it to him.. We think the proper construction to place upon Section 12001, General Code, is that it-was for the protection of married women at a time when they had no right to hold their own separate property ■and no right to bring an action in their own names, or to make contracts in their own names; but since the passage of the Married Woman’s Act in 1887, there is no occasion for the use of Section 12001 except for the purpose of preserving such property of a married woman as came to her husband by marriage prior to the passage of the Married Woman’s Act of 1887. The codifying commission of 1880 and the commission of 1910 no doubt retained this section in the Revised Statutes and in the General Code because they realized that there was at those times, and there still may be, cases in which a woman was married prior to 1887 and brought to her husband personal property and choses in action which were her separate property and which by marriage passed to his dominion and his possession and control; and in order to protect her in the enjoyment of her rights in those properties this section is retained in the statute laws of the state.
It has no application, in our opinion, to the cases of dvomen who have married since the passage of the Married Woman’s Act of 1887, because since that time no condition can arise whereby an action could be brought in the court of common pleas under Section 12001, General Code, by a woman who *266 ha's married since the passage of the act of 1887. So far as women who have been married since the passage of the Married Woman’s Act in 1887 are concerned, this section is obsolete and can have no application to them or their affairs. It would be unnecessary for such a woman to bring such action. In fact, she could not set out a state of facts which would confer upon the court jurisdiction to bring an action, because her property would not pass to her husband by her marriage, as it did before the passage of the Married Woman’s Act of 1887.
'In the case before the court, Mrs'. Dillingham claims that she has separate property in a one-half interest in this business, and that this was acquired ■in 1912. It was not acquired 'by her prior to 1887, and therefore there appears to be no reason for the application of the rules laid down in Section 12001, General Code. If she has an interest in this' property, she may bring an action against her husband to secure this interest without having a receiver appointed. If she were a partner she could come into court and ask for a dissolution of the partnership, a winding up of the business, and the appointment of a receiver to take charge of the business and sell it for the benefit of the partnership. The record does not disclose a state of facts which would- warrant the court in the application of Section 12001, General Code.
We hold that this section can apply only to cases of married women whose property passed into possession of their husbands prior to the passage of the Married Woman’s Act in 1887, and whose husbands took possession of their property by vir *267 tue of the rules of common law, before the wife was emancipated from the husband.
In any event, the court of common pleas was not warranted in appointing a receiver for Frank A. 'Dillingham’s property under Section 12001, General Code. There is no warrant or authority under this section for taking the husband’s property out of his hands and placing it in the hands of a receiver. The only warrant and authority under that 'section is for the appointment of a receiver for the wife’s property. Even if the court were authorized to appoint a receiver under Section 12001, it exceeded its authority in appointing a receiver for the entire property, the husband’s property as well as that claimed by the wife.
It appears from the record in this proceeding that -while this case -was pending in the court of common pleas, and before the-judge of the court of common pleas who heard the matter took up the consideration thereof, counsel for Dillingham, plaintiff in error, made application and motion to the court to send the cause to the judge presiding in the court of domestic relations, for the reason, -as he claimed, that there was at that time pending an action for alimony, and that all the relief prayed for in this case could be granted by the judge of the court of domestic relations, in the alimony case. It appears from the record that the judge refused ¡to -send the cause to the judge presiding in the Court of domestic relations; and it further appears from the record that the judge who presided in the court of domestic relations was of the opinion that he had no jurisdiction to hear and determine this action1.
*268 The view we take of this matter is that the judge of the court of common pleas presiding in the court of domestic relations should have taken this- case and heard and determined it. This Section 12001, General Code, is a part of the chapter relating to divorce and alimony, and, in view of the fact that the judge of the court of common pleas who presides in the court of domestic relations has jurisdiction and special authority from the legislature to hear and determine all matters relating to divorce and alimony, this case should have been sent to that particular judge.
We think it was error on the part of the common pleas court judg.e who heard this case not to have sent the cause to the judge presiding in the court of domestic relations; but we are in- doubt as to whether or not such error was so prejudicial as to warrant a reversal of the judgment, if there ■were no other errors in the record.
For the reasons above stated, the judgment of the court of common pleas will be reversed.

Judgment reversed.

Jones, P. J., and Hamilton, J., concur.